**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DONNELL BLUDSON,

                                        Petitioner,

               - v -                                        Civ. No. 9:06-CV-474
                                                                         (GLS/RFT)

SUPERINTENDENT,

                                        Respondent.

**APPEARANCES:**                              **OF COUNSEL:**

DONNELL BLUDSON
Petitioner, *Pro Se*
Green Haven Correctional Facility
P.O. Box 4000
Stromville, NY 12582

HON. ANDREW M. CUOMO                      ASHYLN H. DANNELLY, ESQ.
Attorney General for the State of New York
Attorney for Respondent
120 Broadway
New York, NY 10271

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER[1]

       *Pro se* Petitioner Donnell Bludson brings this Petition for a Writ of *Habeas Corpus*, pursuant

to 28 U.S.C. § 2254, on the following grounds: (1) his right to a fair trial was violated when the trial

judge allowed the prosecutor to cross-examine him about a previous plea discussion in which

Petitioner had admitted his guilt; (2) he was convicted by a jury with a solitary racial composition

and a juror "who said she would be uncomfortable judging anyone;" and (3) ineffective assistance

---

[1] Pursuant to an Order by the Honorable David G. Larimer, United States District Judge, this case was transferred from the Western District of New York on April 14, 2006.

of counsel under the Sixth Amendment.  Dkt. No. 2, Pet.  For the reasons that follow, it is recommended that the Petition be **denied**.

## I. BACKGROUND

In 1998, an Onondaga Grand Jury indicted Petitioner on two counts of Murder in the Second Degree, two counts of Burglary in the First Degree, and Criminal Possession of a Weapon in the Second Degree.[2]  Dkt. No. 14, Ashlyn Dannelly, Esq., Decl., State Court R. (hereinafter "R."), Ex. E, Pet'r Appellate Div. Br., App. (hereinafter "App.") at A9-10.[3]  On February 2, 1999, after a jury trial, Petitioner was found guilty on all counts.  R., First Hr'g Tr., dated Jan. 25-29, Feb. 1-2, 1999, (hereinafter "First Hr'g Tr.") at pp. 1522-26.  On direct appeal however, the New York State Court of Appeals reversed the decision of the New York State Supreme Court, Appellate Division, Fourth Department, which had affirmed the decision.  *People v. Bludson*, 736 N.Y.S.2d 289 (2001).  The Court of Appeals ordered a new trial on the grounds that the trial court erred in denying Petitioner's challenges for cause against two prospective jurors.  *Id*. at 291.

With the verdict overturned, Petitioner went to trial again.  At trial, two eye witnesses testified that on May 10, 1998, Petitioner entered into the apartment of David Little and Jennifer Geigel, followed Little into the bathroom, and shot him several times with a gun.  R., Ex. D, Second Hr'g Tr., dated Jan. 17, May 20, 22-24, 28-29, 2002, (hereinafter "Second Hr'g Tr.") at pp. 379-402 & 501-23.  Geigel testified she met Petitioner, whose moniker is "Dog," and his friend Robert

---

[2] It is unclear exactly when the indictment was filed because the date does not appear on the copy of the indictment provided in the appendix submitted along with the Appellate Division briefs, and nor is a date referenced in the record.  However, it must have been filed after May 10, 1998, the date of the murder, and before February 2, 1999, the date Petitioner was convicted at trial.

[3] The appendix submitted along with the Appellate Division briefs, which was stipulated to by both parties, has been numbered A1-A391.  We will refer to said numbering for ease of reference.

Saxon, whose nickname is "Whip Whop," in April 1998. *Id.* at p. 392. She stated that the day before her fiancé David Little was murdered, Little yelled at Petitioner because he was talking to Geigel through their kitchen window. *Id.* at pp. 394-96. Petitioner took the stand and testified that he moved to Syracuse with Robert Saxon around March 1998. *Id.* at pp. 686-87. He stated that Geigel and Saxon had a romantic relationship, and that on May 9, 1998, Saxon called Petitioner and asked him to check on Geigel because David Little had allegedly beaten her. *Id.* at p. 693. According to Petitioner, on the date of the murder, he and Saxon went to Little's apartment and Petitioner stood outside while Saxon entered the apartment and returned shortly thereafter with a warm gun, which he handed to Petitioner. *Id.* at pp. 698-700.

On June 14, 2002, the jury convicted Petitioner on two counts of Murder in the Second Degree (N.Y. PENAL LAW §§ 125.25(1), (3)), two counts of Burglary in the First Degree (N.Y. PENAL LAW §§ 140.30(1), (2)), and one count of Criminal Possession of a Weapon in the Second Degree (N.Y. PENAL LAW § 265.03). Second Hr'g Tr. at pp. 828-30. Petitioner was sentenced to twenty-five (25) years to life imprisonment for each count of second degree murder, eight and one third to twenty-five (8 1/3 - 25) years imprisonment for each first degree burglary count, and five to fifteen (5-15) years imprisonment for the second degree weapons possession charge; with the exception of one of the sentences for first degree burglary, the trial court ordered that all of the sentences would run concurrently. R., Ex. D, Sentencing Hr'g Tr., dated June 14, 2002 (hereinafter "Sentencing Tr."), at pp. 12-13.

Prior to perfecting his direct appeal, Petitioner filed a *pro se* motion to vacate the conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10(h) on the grounds that the police lacked probable cause to arrest him and that his arrest was illegal because it occurred inside a

*-3-*

residence and without a warrant. R., Ex. F, *Pro Se* § 440 Mot, dated Nov. 25, 2003. The trial court

denied his motion on both procedural and substantive grounds. R., Ex. F, Decision/Order, dated

Mar. 16, 2004. Petitioner did not seek leave to appeal that decision.

Petitioner thereafter appealed to the New York State Appellate Division, Fourth Department,

which unanimously affirmed the verdict. *People v. Bludson,* 788 N.Y.S.2d 758 (N.Y. App. Div. 4th

Dep't 2005). The New York Court of Appeals denied leave to appeal. *People v. Bludson*, 801

N.Y.S.2d 806 (N.Y. 2005). Petitioner filed the instant *habeas* Petition on March 26, 2006. Dkt. No.

2, Pet.

## II. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110

Stat. 1214 (1996) ("AEDPA"), a federal court may not grant habeas relief to a state prisoner on a

claim unless the state court adjudicated the merits of the claim and such adjudication either

> 1) resulted in a decision that was contrary to, or involved an unreasonable
> application, of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
> 2) resulted in a decision that was based on an unreasonable determination of the facts
> in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Hawkins v. Costello*, 460 F.3d 238 (2d Cir. 2006); *DeBerry v. Portuondo*, 403
F.3d 57, 66 (2d Cir. 2005); *Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003); *Boyette v.
Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001).

The petitioner bears the burden of proving by a preponderance of the evidence that he is "in

custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §

2254(a); *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997); *Rivera v. New York*, 2003 WL 22234679,

at *3 (S.D.N.Y. Aug. 28, 2003). The AEDPA also requires that "a determination of a factual issue

made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. §

2254(e)(1); *see also DeBerry v. Portuondo*, 403 F.3d at 66; *Boyette v. LeFevre*, 246 F.3d at 88

(quoting § 2254(e)(1)) (internal quotations omitted).

The Second Circuit has provided additional guidance concerning application of this test,

noting that:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may
> grant habeas relief:  1) Was the principle of Supreme Court case law relied upon in
> the habeas petition "clearly established" when the state court ruled? 2) If so, was the
> state court's decision "contrary to" that established Supreme Court precedent? 3) If
> not, did the state court's decision constitute an "unreasonable application" of that
> principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams and Francis S. v. Stone*, 221

F.3d 100, 108-09 (2d Cir. 2000)).

## B.  Exhaustion

A state prisoner must normally exhaust available state judicial remedies before a federal

court will entertain his petition for *habeas corpus*.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842

(1999).  To satisfy the exhaustion requirement with respect to a claim, petitioner must "present the

substance of the same federal constitutional claim[s]" to the state courts "that he now urges upon

the federal courts."  *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (internal quotation marks

omitted) (citing *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir. 2001)).  "A federal constitutional

claim has not been fairly presented to the State courts unless the petitioner has informed those courts

of all the 'essential factual allegations' and 'essentially the same legal doctrine he asserts in his

federal petition.'"  *Id.* (citing *Daye v. Attorney Gen. of the State of New York*, 696 F.2d 186, 191 (2d

Cir. 1982) (further citing *Picard v. Connor*, 404 U.S. 270, 276-277 (1971)).

However, a claim may be "fairly present[ed] to the state courts[,] . . . without citing chapter

and verse of the Constitution," if there is: (a) reliance on pertinent federal cases employing

constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, or (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.  *Daye v. Attorney Gen. of the State of New York*, 696 F.2d at 191; *see also Smith v. Duncan*, 411 F.3d 340, 348 (2d Cir. 2005).

In the present case, Respondent asserts Petitioner has not properly exhausted his second and third claims of ineffective assistance of counsel and improper impaneling of the jury, respectively. In his direct appeal to the Appellate Division, Fourth Department, Petitioner submitted a *pro se* brief that raised the claim of ineffective assistance of counsel.  R., Ex. E, *Pro Se* Br.  However, Petitioner's attorney failed to attach that brief to Petitioner's leave application to the Court of Appeals.  R., Ex. E, Lv. App.  Thus, his ineffective assistance of counsel claims were not fairly presented to the Court of Appeals, and are therefore unexhausted.  *See, e.g., Wallace v. Artus*, 2006 WL 738154, at *3 (S.D.N.Y. Mar. 23, 2006) (holding petitioner's claim unexhausted when counsel failed to raise claims from a *pro se* brief in the leave application).  Indeed, the Second Circuit has held that even where appellate briefs have been attached to a leave application, issues not specifically identified in the leave appeal letter have not been "fairly presented" and should be deemed unexhausted.  *See Grey v. Hoke*, 933 F.2d at 120; *cf. Morgan v. Bennett*, 204 F.3d 360, 369-71 (2d Cir. 2000) (holding that a petitioner who filed a *pro se* brief along with his leave application and specifically asked the Court of Appeals to consider the arguments therein had exhausted his claims).  Petitioner's claims regarding the racial composition of the jury and the improper impaneling of one jury member were not raised on direct appeal and are therefore unexhausted.  R., Ex. E, Pet'r Appellate Div. Br. & *Pro Se* Br.

Thus Petitioner's first claim that his right to a fair trial was violated is exhausted, but his second and third claims are unexhausted. Prior to the enactment of the AEDPA, federal courts were required to dismiss such "mixed" petitions, requiring total exhaustion. *Rose v. Lundy*, 455 U.S. 509, 510 (1982). However, under the AEDPA, courts have discretion to deny an unexhausted claim on the merits, rather than require exhaustion. 28 U.S.C. § 2254(b)(2); *see also Marziale v. Walker*, 2000 WL 33767753, at *3 (N.D.N.Y. May 4, 2000) (Sharpe, M.J.).

While the Second Circuit has not yet articulated the appropriate standard to be utilized in determining whether an unexhausted claim should be denied on the merits, those district courts that have addressed the question appear to utilize two somewhat distinct standards. Some courts have reviewed unexhausted claims to determine if they were "patently frivolous." *See*, *e.g.*, *Acosta v. Couture*, 2003 WL 272052, at *7 (S.D.N.Y. Jan. 23, 2003); *Pacheco v. Artuz*, 193 F. Supp. 2d 756, 761 (S.D.N.Y. 2002); *Hammock v. Walker*, 224 F. Supp. 2d 544, 549 (W.D.N.Y. 2002); *Cruz v. Artuz*, 2002 WL 1359386, at *8 (E.D.N.Y. June 24, 2002). Other courts have chosen instead to analyze the claim to determine if it is "perfectly clear that the petitioner does not raise even a colorable federal claim." *Rosario v. Bennett*, 2002 WL 31852827, at *17 (S.D.N.Y. Dec. 20, 2002) (noting the diverging views on this issue without deciding which standard is appropriate); *see also Lambert v. Blackwell*, 134 F.3d 506, 514-15 (3d Cir. 1997). This Court need not decide which of these tests should be utilized in considering this aspect of the Petition because under either standard, Bludson's claims for relief are meritless. We will therefore address all Petitioner's claims for relief on the merits.

### C. Right to a Fair Trial

Petitioner claims his right to a fair trial was violated when the trial judge allowed the prosecutor to cross-examine him about statements he made during a pre-indictment plea discussion. He asserts that "[f]or the jury to hear that I previously admitted to committing these crimes, my right to a fair trial became prejudice[d] due to the fact that no agreement was made upon record that the D.A. could question me if I testified differently on the stand." Pet. at p. 7. Petitioner raised this claim in his direct appeal.[4] The Appellate Division, Fourth Department, rejected this claim, holding that Petitioner waived the claim because "[t]he record establishes that [Petitioner] previously agreed to the use of [the] statements in the event that he testified, while the People in exchange agreed that they would not cross-examine [him] with respect to another statement that he made."[5]

At trial, Petitioner was represented by James McGinty and Frederick O'Rourke. At a pre-trial hearing held on May 13, 2002, the Honorable John J. Burnetti, Onondaga County Judge, asked Mr. Dougherty, the prosecutor, what his theory was as to why the murder was committed, and the following colloquy ensued:

MR. DOUGHERTY:   Judge, all I can tell you is what the defendant told us is that and I agree with Mr. McGinty from the information we have, it was not drug related. It was more Robert Saxon was interested romantically in the victim's fiancee [sic] and Robert Saxon agreed to pay this Defendant so much money to go in there and to

---

[4] Respondent asserts in a footnote that the portion of Petitioner's claim concerning the lack of a record for the alleged agreement was not presented to the Appellate Division and is therefore potentially unexhausted. Dkt. No. 15, Resp't Mem. of Law, at p. 24 n.8. However, Petitioner did arguably raise this aspect of his claim in his Appellate Division Brief. Pet'r Appellate Div. Br. at p. 29 ("If there was a quid pro quo in this contract of adhesion it was not made of record in the Appellant's case."). Therefore, we will address this claim on its merits.

[5] The Appellate Division also stated in the alternative that "[e]ven assuming, arguendo, that defendant did not waive his present contention, we nevertheless conclude that it is not preserved for our review ( see CPL 470.05[2] ), and we decline to exercise our power to review that contention as a matter of discretion in the interest of justice ( see 470.15[6][a] )." *People v. Bludson*, 788 N.Y.S.2d at 759. We need not address this second ground for dismissal because this claim fails on its merits.

|                    | kill David Little. |
|--------------------|--------------------|
| THE COURT:         | All right. |
| MR. DOUGHERTY:     | But that, again, that's not going to come out either unless the Defendant takes the stand. |
| THE COURT:         | Because. |
| MR. DOUGHERTY:     | He told us that in a debriefing and we had an agreement that that wouldn't be used against him unless he took the stand and told another story. |

\* \* \*

|                    | |
|--------------------|--------------------|
| MR. DOUGHERTY:     | We don't have any Sandoval issues.  He did not have any criminal record before this occurred and that was brought out before and so just so you're aware, there aren't any Sandoval issues.  The only other issue in that regard is we did debrief Mr. Bludson with Mr. O'Rourke and police officers back in July of 1998 and he did tell us his version of what actually occurred on Mother's Day back then.  We agreed not to use that against him and see if we could somehow build a case against Mr. Bludson but it was the agreement that should he take the stand in the trial and say something other than what he told us in the debriefing, we could cross-examine him with what he told us in that debriefing and that not only do my notes reflect that, it was made part of the record way back when with Judge Hafner by Mr. O'Rourke. |
| MR. O'ROURKE:      | And I believe that's a correct statement of what the agreement was at the time, Judge, that if he did take the stand, he did testify, if he testified conversely to what he has told, he could be cross-examined about it.  That was our agreement. |

Second Hr'g Tr. at pp. 10-11 & 19-20.

Thus, Petitioner's attorney recognized that an agreement was made during a debriefing in 1998, which provided that Petitioner's statements during that meeting would not be used against him unless he took the stand and testified inconsistently with those statements.  At trial, Petitioner offered testimony suggesting that Robert Saxon ("Whip-Whop") committed the murder.  *Id.* at pp. 697-700.  Such testimony contradicted the statements he gave to police during his pre-plea negotiations, opening the door for the prosecutor to impeach him with those statements pursuant to

their agreement. *Id.* at pp. 734-35.

Petitioner stated at trial that the purpose of the debriefing was to "explain what was going on, to give [the prosecutors] a better view of what was happening and to help get Whip Whop." *Id.* at p. 734.   Petitioner does not allege the agreement did not exist or that he entered into it unknowingly or involuntarily, only that it was not made on the record and that counsel should have investigated whether the use of such statements during cross-examination was proper "without any quid pro quo."[6]  Pet. at p. 8.

In terms of federal law, generally speaking , statements made by a defendant during pre-plea negotiations are inadmissible at trial.  *See* FED. R. EVID. 410; *see also United States v. Gomez*, 210 F. Supp. 2d 465, 472 (S.D.N.Y. 2002).  However, that protection may be waived as a part of valid pre-plea proffer agreements and plea bargain agreements, as long as they are entered into voluntarily, knowingly, and intelligently.  *See United States v. Velez*, 354 F.3d 190 (2d Cir. 2004) (upholding the enforceability of a proffer agreement that included a waiver of the protections afforded by Federal Rule of Evidence 410).  Furthermore, although Petitioner asserts he was given nothing in return for his participation in the pre-plea discussion, the meeting with prosecutors provided Petitioner with "the opportunity to be heard by the government, . . . an opportunity to which [a] defendant otherwise has no right."  *United States v. Parra,* 302 F. Supp. 2d 226, 239 (S.D.N.Y. 2004) (internal quotation marks and citations omitted) (rejecting defendant's claim that his proffer agreement was void under contract law for lack of consideration).  By Petitioner's own words, the purpose of the meeting was to assist the government in their case against Whip Whop (Robert Saxon), and at trial, Petitioner attempted to convince the jury that it was Whip Whop, not

---

[6] Petitioner's ineffective assistance of counsel claims are addressed below in Part II.D.

he, who committed the murder.

As to Petitioner's claim that the trial court should not have permitted the use of his inculpatory statements on cross-examination because the pre-plea agreement was not memorialized on the record, there is no requirement, constitutional or otherwise, that such an agreement be made on the record in order for it to be enforceable. *United States v. Gomez*, 210 F. Supp. 2d at 475 ("A proffer agreement is a contract that should be enforced in accordance with principles of contract law."). Indeed, by their nature, many proffer agreements are entered into orally. *See United States v. Fronk*, 173 F.R.D. 59, 69 (W.D.N.Y. 1997) (holding that oral proffer agreements fall within the ambit of FED. R. EVID. 11 and are enforceable). In that respect, we note again that Petitioner does not claim that the agreement did not exist, nor that he entered into the agreement involuntarily, unknowingly, or unintelligently. *See generally* Pet.

Therefore, the use of Petitioner's inculpatory statements during cross-examination does not amount to a constitutional violation and this claim should be **dismissed**.

### D.  Ineffective Assistance of Counsel

Petitioner makes the following claims of ineffective assistance of counsel under the Sixth Amendment of the United States Constitution: (1) counsel advised Petitioner to implicate himself in order to receive a more favorable sentence; (2) counsel accepted all of the district attorney's exhibits "without submitting any new evidence along with not getting any investigators;" (3) counsel made no inquiry into the issue of whether the prosecutor could use Petitioner's statements from the pre-plea negotiations at trial; (4) counsel submitted Petitioner's co-defendant's statement which implicated Petitioner; and (5) counsel did not subpoena the co-defendant to testify. Pet. at pp. 7-8.

To establish ineffective assistance of counsel, a *habeas* petitioner must show 1) counsel's

representation fell below an objective standard of reasonableness measured by the prevailing professional norms; and 2) prejudice, i.e., there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688 & 694 (1984) (cited in *Bell v. Cone*, 535 U.S. 685, 695 (2002)); *see also Aeid v. Bennett*, 296 F.3d 58, 62-63 (2d Cir. 2002); *Brown v. Artuz*, 124 F.3d 73, 79-80 (2d Cir. 1997); *Rattray v. Brown*, 261 F. Supp. 2d 149, 157 (E.D.N.Y. 2003).[7]   In determining the reasonableness of counsel's conduct, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"   *Strickland v. Washington*, 466 U.S. at 689.

Petitioner's first basis for his claim of ineffective assistance of counsel is that his attorney "advised me to implicate myself in these crimes because I would gain a favorable plea of Manslaughter [in the first degree] and receive a 3 ½ - 9 sentence for accepting my responsibilities. When I refused to co-operate [sic] with the D.A. [the] Judge allowed the D.A. to use our plea-discussion against me at trial."[8]  Pet. at p. 7.  As discussed in the previous section, Mr. O'Rourke, one of Petitioner's two trial attorneys, acknowledged the existence of an agreement, apparently made as a condition precedent to plea bargain negotiations, wherein it was agreed between Petitioner and the district attorney that any statements Petitioner made during the pre-plea discussions would be used against him only if he took the stand at trial and testified inconsistently with those statements. Second Hr'g Tr. at pp. 10-11 & 19-20.

---

[7] In *Williams v. Taylor*, the Supreme Court declared that "the rule set forth in *Strickland* qualifies as 'clearly established Federal law[.]'"  529 U.S. 362, 391 (2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001).

[8] This claim actually appears in Petitioner's first claim which was addressed in Part II.C, *infra*, however we construe it liberally to assert a separate basis for Petitioner's third claim of ineffective assistance of counsel.  *See* Pet. at pp. 7-8.

The record does not reveal why Mr. O'Rourke thought such an agreement would be strategically advantageous for Petitioner, although Petitioner asserted at trial that the intent was to "explain what was going on, to give [the prosecutors] a better view of what was happening and to help get Whip Whop." *Id.* at p. 734. However, even if we assume that Mr. O'Rourke advised Petitioner to implicate himself, and that such advise fell below an objective standard of reasonableness, there is no reasonable probability that, but for such unreasonable representation, the outcome of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

At trial, two eye-witnesses, Jennifer Geiger and Renee Little, David Little's sister, testified that they saw Petitioner come into the apartment, follow the victim into the bathroom, and shoot him several times. Second Hr'g Tr. at pp. 379-402 & 501-23. When police officers found Petitioner the day after the shooting, he attempted to run to the back of the apartment where he was arrested. *Id.* at p. 498. Shortly after his arrest, Petitioner told police upon questioning that he had been with his girlfriend at the time of the crime and had nothing to do with the murder. *Id.* at p. 478. However, when he was told that two witnesses he seen him commit the crime, he changed his story and gave a statement to police that was read into the record at trial. In his statement, Petitioner stated that he had gone over to the victim's apartment because he suspected that the victim had taken a dog he was watching for Robert Saxon. He stated that once there, he got in a fight with the victim on the stairs outside the apartment, the two fought their way up the stairs, and then David Little ran into the bathroom where he pulled a handgun from under the sink; a struggle ensued and the gun fired three times. *Id.* at pp. 481-85. At trial, Petitioner testified that he did not enter the apartment at any time,

and that he waited outside while Robert Saxon entered the apartment and then handed Petitioner a warm gun after he came out. *Id.* at pp. 697-700.

Thus, even discounting Petitioner's inculpatory statements made during the pre-plea negotiations, he had already offered to police two distinct accounts of his involvement in the crime prior to trial: the first account was that he had no involvement in the crime and was with his girlfriend at the time of the murder, the second was that he shot the victim in self-defense during a physical confrontation. At trial, Petitioner offered another version wherein he stood outside the apartment while Saxon went inside and ostensibly committed the murder.[9] Additionally, the testimonial evidence, which included two eye-witnesses, weighed heavily against Petitioner. Therefore, even if Petitioner's inculpatory statements had never been introduced at trial, there is no reasonable probability that the outcome would have been different. As such, Petitioner's first claim of ineffective assistance of counsel should be **dismissed**.

Petitioner's second claim of ineffective assistance of counsel is that his attorneys accepted all of the district attorney's exhibits "without submitting any new evidence along with not getting any investigators." This claim is conclusory. Petitioner does not identify any exhibits that should have been introduced, nor what type of investigators should have been utilized and what benefit using them would have brought. "Such undetailed and unsubstantiated assertions that counsel failed to conduct a proper investigation have consistently been held insufficient to satisfy either *Strickland* prong." *Polanco v. United States*, 2000 WL 1072302, at *10 (S.D.N.Y. Aug. 3, 2000) (citing cases); *see also Sweat v. United States*, 2005 WL 3179672, at *8 (N.D.N.Y. Nov. 29, 2005) (citing cases for the proposition that "generalized and vague claims of counsel's ineffectiveness" do not state a

---

[9] Petitioner stated at trial that he did not see Saxon shoot Little and that he did not hear any gunshots while waiting outside the apartment. Second Hr'g Tr. at pp. 721-22.

*-14-*

valid claim under *Strickland*).  Therefore, this claim should be **dismissed** as conclusory.

In his third claim of ineffective assistance of counsel, Plaintiff states that his counsel made no inquiry into the issue of whether the prosecutor could use Petitioner's statements from the pre-plea negotiations at trial.  However, such agreements are constitutionally and procedurally valid unless they are entered into involuntarily, unknowingly or unintelligently.  *See infra* Part II.C.  Since Petitioner does not assert that the agreement was defective and there is no indication on the record of the same, Petitioner's third ineffective assistance claim that counsel failed to inquire as to whether the statements made at the plea discussion could be used at trial is without merit and should be **dismissed**.

Petitioner's fourth and fifth claims of ineffective assistance of counsel are that his trial counsel provided constitutionally defective representation when he submitted Robert Saxon's statement that implicated Petitioner, and when he failed to subpoena Saxon to testify.  The record shows that Petitioner's attorneys' strategy was to create a reasonable doubt as to whether Petitioner committed the murder by implicating Robert Saxon in the crime.  In furtherance of that strategy, counsel called Syracuse Police Detective Richard Morris, who interviewed Saxon and took his written statement on May 10, 1998.  Second Hr'g Tr. at pp. 648-60.  Morris read Saxon's statement to the jury.  In his statement, Saxon stated that he and Jennifer Geigel, David Morris's fiancé, were romantically involved at the time of the murder, and that Jennifer called him a few days before the murder while he was in New York City and told him that David Little had beaten her.  *Id*. at p. 654. Saxon stated he saw Petitioner standing at the top of the stairs outside of David Little's apartment pointing a gun, and that he subsequently heard three shots fired.  Saxon stated that on the day of the murder Petitioner went to Little's apartment upset because he thought David Little had taken a dog

that Saxon had entrusted to Petitioner while he was away in New York City. *Id*. at p. 656. Saxon also stated that the morning after the murder, Petitioner confessed committing the crime to him. *Id*. at p. 658.

Petitioner's counsel argued in closing that Saxon was the one who had a motive to kill David Little because of his romantic relationship with Jennifer Geigel. He also argued that Geigel's testimony was not credible because she completely denied any romantic relationship with Saxon. Counsel compared Saxon's statement to Petitioner's recorded statement (in which he claimed killing Little in self-defense) in order to argue that Saxon must have been present in the apartment and committed the murder himself because his statement was more detailed and accurate than Petitioner's. *Id*. at p. 757-59.

Given the abundance of evidence against Petitioner, including Petitioner's own statements, the use of Saxon's statement to support the theory that Saxon committed the murder did not fall below an objective standard of reasonableness. When it comes to strategic decisions, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Petitioner has not overcome that presumption on this claim.

The decision not to call Robert Saxon as a witness also appears to have been a strategic one. At a pre-trial hearing, Mr. McGinty, Plaintiff's co-counsel, stated that he would discuss with Petitioner whether or not they should attempt to subpoena Saxon. Second Hr'g Tr. at p. 25. Petitioner offers no evidence that Saxon could or would have offered exculpatory evidence. Indeed, were he subpoenaed and called as a witness, Saxon would most likely have further implicated Petitioner in the crime while denying his own involvement. Therefore, having Saxon's statement

read to the jury in order to infer his involvement, while preventing him from implicating Petitioner

on the stand by not calling him as a witness, was not an unreasonable trial strategy.  In any event,

the decision to call a witness, or not, is a strategic decision, and therefore will not generally form

the basis for a valid claim of ineffective assistance of counsel.  *See United States v. Best*, 219 F.3d

192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to whether to call specific witnesses - even ones

that might offer exculpatory evidence - is ordinarily not viewed as a lapse in professional

representation.") (internal quotation marks and citation omitted).

Thus, Petitioner has failed to meet his burden under the first prong of the *Strickland* test with

respect to his claim that Saxon's statement should not have been read to the jury and that Saxon

should have been subpoenaed and called as a witness.  Although the test for ineffective assistance

of counsel contains two prongs, the Supreme Court has held that federal district courts need not

address both components if a petitioner fails to establish either one.  *Strickland v. Washington*, 466

U.S. at 697.   Therefore, these claims are without merit and should be **dismissed**.

### E.  Improper Jury Impaneling

Petitioner asserts that "[b]y having been convicted by an all white jury and by a juror who

said she would be uncomfortable judging anyone about their crime," he suffered a miscarriage of

justice.  Pet. at p. 8.  As Respondent notes, Petitioner does not allege that any prospective juror

member was wrongly stricken from the panel because of his or her race, and therefore does not

appear to assert that his rights under *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) were violated. In

that respect, the record does not reflect any challenged strikes.  *See generally* Second Hr'g Tr. at pp.

1-317.  It is unclear from the hearing transcript whether the jury was in fact uniformly Caucasion;[10]

however, even assuming it was, Petitioner fails to explain why such a jury composition deprived him

of the right to a fair trial.

With respect to Petitioner's claim that a juror who said she would be uncomfortable judging

anyone about their crime was improperly impaneled, Petitioner has not identified which juror should

not have been on the jury.  A review of the hearing transcript reveals that three prospective jurors

expressed discomfort at the idea of rendering a verdict, and all three were excused on consent.

Second Hr'g Tr. at pp. 89-91, 200-03, & 215-16.  Furthermore, a prospective juror's statement that

she would be uncomfortable judging anyone about their crime does not, by itself, signify that such

juror is unfit to serve on the jury.

In sum, both of these claims are conclusory and fail to allege constitutional violations that

could be grounds for *habeas* relief.  Therefore, these claims should be **dismissed**.

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Petition for a Writ of *Habeas Corpus* be **DENIED**; and it is

further

**RECOMMENDED**, that because the Court finds Petitioner has not made a "substantial

showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no certificate of

appealability should issue with respect to any of Petitioner's claims. *See* 28 U.S.C. § 2253(c)(2) ("A

certificate of appealability may issue . . . only if the applicant has made a substantial showing of the

---

[10] During *voir dire*, the trial court noted that there were not "that many black jurors" during a discussion about
a prospective juror, who was ostensibly black, and whose father had participated in the investigation.  Second Hr'g Tr.
at p. 66.  That juror was dismissed on consent.  *Id.*

*-18-*

denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000) *cert. denied* 531 U.S. 873 (2000); and it is further

      **ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   February 23, 2009
       Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge